IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TEAM LOGISTICS, INC., et al.,           )
                                        )
                Plaintiffs,             )
                                        )
vs.                                     )          Case No. 04-2061-JPO
                                        )
ORDERPRO LOGISTICS, INC., et al.,       )
                                        )
                Defendants.             )


## MEMORANDUM AND ORDER

### I.  Introduction

This case comes before the court[1] on the motion of plaintiff Paul Titus for a citation for defendant OrderPro Logistics, Inc. ("OrderPro") to show cause why it should not be punished for indirect civil contempt **(doc. 224)**.  The court held an evidentiary hearing on the motion on September 14, 2007.  After the hearing, the court ordered the parties to file proposed findings of fact and conclusions of law, addressing, among other issues, the legal issue of holding a corporation in contempt for failure to comply based on impossibility (*see* docs. 238 and 248).  The parties[2] have filed their proposed findings of fact and conclusions

---

[1]On September 6, 2005, by consent of all parties, this case was reassigned for disposition from Hon. John W. Lungstrum, U.S. District Judge, to the undersigned U.S. Magistrate Judge, James P. O'Hara (*see* doc. 159).

[2]Although the proposed findings of fact and conclusions of law and the reply purport to be filed on behalf of both plaintiffs, Team Logistics, Inc. ("Team Logistics") and Mr. Titus, the motion at issue was only filed by Mr. Titus.

of law (docs. 249 and 252) and Mr. Titus has filed his reply (doc. 253).[3]  The court is ready to rule.

## II.   Factual Background and Consent Judgment

Highly summarized, this case arises out of the negotiations surrounding and performance of a purchase agreement between the plaintiffs Team Logistics and its owner, Mr. Titus, and the defendants OrderPro and its officers and directors, Richard Windorski and Jeffrey Smuda.  Plaintiffs filed their complaint on February 18, 2004 alleging a breach of contract claim against OrderPro, and breach of fiduciary duty, misrepresentation, fraud, and civil conspiracy claims against OrderPro, Mr. Windorski, and Mr. Titus (*see* doc. 1).  OrderPro asserted counterclaims against plaintiffs for rescission, breach of contract, misappropriation of business opportunities, and fraudulent misrepresentation (*see* doc. 10).  The court entered an order of default judgment against OrderPro as to all of plaintiffs' claims, with the issue of damages to be determined later, and dismissed OrderPro's counterclaims against plaintiffs (*see* doc. 52).

Mr. Smuda filed for bankruptcy in June 2004 (*see* doc. 53).  At the September 14,

---

[3]Mr. Titus filed a correction to his reply to correct an error in the body of the reply itself (doc. 256).  An exhibit attached to Mr. Titus's reply reports the current value of OrderPro stock to be $.003 per share.  Doc. 253, ex. 4.  The reply incorrectly stated that the current value was .03 cents per share.  *See* doc. 256.  On March 31, 2008, Mr. Titus filed a supplemental reply (doc. 257).  Mr. Titus seems to have filed the supplement to present several recent press releases by OrderPro indicating it is acquiring new businesses.  The court will consider Mr. Titus's correction to his reply but will not consider his supplemental reply, which was filed without leave of court.

2007 evidentiary hearing, the court clarified the status of the claims against Mr. Smuda and his role in the current contempt dispute.  Plaintiffs did not seek relief from a stay of their claims against Mr. Smuda while the case was in bankruptcy and did not object to their claims against him being discharged in bankruptcy.  Plaintiffs' claims against Mr. Smuda related to conduct before he filed for bankruptcy and were discharged in his bankruptcy proceedings. Mr. Titus's pending motion before the court is against OrderPro by and through its officers. Mr. Smuda therefore appeared at the evidentiary hearing solely in his capacity as president and chief executive officer ("CEO") of OrderPro, not as an individual defendant.[4]

After a somewhat convoluted and contentious history, this case was set for trial on December 1, 2005.  However, on November 10, 2005, Hon. Gerald L. Rushfelt, U.S. Magistrate Judge, conducted a settlement conference, during which the parties reached a settlement which was put on the record (see doc. 203).  Plaintiffs and OrderPro memorialized the terms of their settlement by entering into a Full and Final Settlement Agreement (the "Agreement") on December 12, 2005 (doc. 209, ex. 1).[5]  Among several other terms, the Agreement required OrderPro to transfer to Mr. Titus 7 million shares of freely tradable

---

[4]During the September 14, 2007 evidentiary hearing, the court corrected its August 16, 2007 order which incorrectly stated that Mr. Smuda appeared at a telephone status conference held that day as an individual, in addition to his capacity as president and CEO of OrderPro (see doc. 227).

[5]Plaintiffs and Mr. Windorski entered into a separate settlement agreement, which is not currently at issue before the court.

OrderPro stock, i.e., without so-called "Section 144" restrictions,[6] which were held by Mr. Smuda by the end of December 2005.[7]  The Agreement also provided that OrderPro would pay Mr. Titus $90,000 in three $30,000 installment payments, with the first one due January 15, 2006.[8]  OrderPro was to provide plaintiffs' attorney with a non-appealable consent judgment against OrderPro in the amount of $135,000 with post-judgment interest at a rate of ten percent.  Plaintiffs' attorney was authorized to file the consent judgment with the court only if OrderPro failed to make one of its $30,000 payments on time.[9]

On January 25, 2006, plaintiffs filed a motion to enforce the Agreement with OrderPro (doc. 209).  Plaintiffs argued OrderPro failed to transfer to Mr. Titus the 7 million shares of freely tradable OrderPro stock by the end of December 2005.  Plaintiffs also alleged OrderPro defaulted on another provision of the Agreement by failing to pay its first installment payment of $30,000 by January 15, 2006.  Plaintiffs stated that the consent judgment OrderPro apparently provided plaintiffs' attorney contemplated the shares had already been transferred to Mr. Titus.  Therefore, although authorized by the Agreement, plaintiffs did not file the consent judgment against OrderPro because they did not want to

---

[6] Although not entirely clear from the parties' papers, the court believes they are addressing the restrictions imposed by Rule 144 promulgated by the Securities Exchange commission ("SEC").  *See* 17 C.F.R. § 230.144.

[7] Doc. 209, ex. 1, at para. 3(a).

[8] *Id.* at para. 3(d).

[9] *Id.* at para. 3(e).

waive their right to receive the shares of stock.

OrderPro did not timely oppose plaintiffs' motion to enforce the Agreement. The court granted plaintiffs' motion and entered a consent judgment against OrderPro (the "Consent Judgment") on February 14, 2006 (doc. 211). In the Consent Judgment, the court made several findings of fact, including that Mr. Titus had not waived his legal right to receive the stock shares or otherwise enforce the remaining terms of the Agreement. Further, the Consent Judgment incorporated by reference a copy of the Agreement[10] and explicitly required OrderPro to perform several terms of the Agreement:

> 7. Consistent with the terms of the Agreement, and as a part of this consent judgment, OrderPro shall immediately transfer to Titus 7 million shares of freely tradeable OrderPro stock (i.e., without Section 144 restrictions).
>
> 8. Consistent with the terms of the Agreement, and as a part of this consent judgment, OrderPro shall notify Titus of all meetings of OrderPro's board of directors, which meetings OrderPro may elect for Titus to attend in person or by telephone as a non-voting advisor. OrderPro shall reimburse Titus for his reasonable and preauthorized expenses incurred at the request of the board of directors, including required travel expenses to attend board meetings or expenses incurred by Titus for other efforts to serve OrderPro business as approved by the board of directors. OrderPro shall reimburse Titus for such expenses within fifteen days of receipts being submitted to the company.
>
> 9. Based on the Agreement of the parties, judgment is hereby granted in favor of Titus and against OrderPro, in the amount of $135,000, plus interest hereafter at the rate of 10% per annum until paid in full, and the costs of this action.[11]

---

[10]Doc. 211, at 1 n.2.

[11]*Id.* at 2-3.

The court found Mr. Titus was entitled to attorney's fees incurred in filing the motion to enforce the Agreement against OrderPro.  Because the record was silent as to the amount of fees incurred, the court stated Mr. Titus could file a separate motion to alter or amend the Consent Judgment to impose the fees as a matter of contract law.  The court ordered the parties to follow the procedure in D. Kan. Rule 54.2 which deals with statutory awards of attorney's fees.[12]  Plaintiffs have not filed such a motion to alter or amend the Consent Judgment.  However, Mr. Titus's motion before the court seeks attorney's fees and additional costs incurred in seeking enforcement of the Consent Judgement.

The court retained ancillary jurisdiction to enforce the Agreement unless and until the Consent Judgment was filed in another jurisdiction for enforcement purposes.  In accordance with the Agreement, the Consent Judgment was a final and non-appealable judgment against OrderPro.[13]

On July 23, 2007, Mr. Titus filed the instant motion for citation for OrderPro to show cause why it should not be punished for indirect civil contempt.  Mr. Titus attached his affidavit claiming OrderPro had not complied with several terms of the Consent Judgment. As noted above, the court then held an evidentiary hearing on September 14, 2007.

---

[12]*Id.* at 3.

[13]*Id.*

III.   Findings of Fact[14]

Mr. Smuda was president of OrderPro at least as of December 12, 2005, when he signed the Agreement.[15]  OrderPro admits in its proposed findings of fact that Mr. Smuda is currently the president of OrderPro.  Mr. Titus presented evidence that as of the time of the evidentiary hearing Mr. Smuda was the sole corporate officer and CEO.[16]  Based on this evidence, the court finds Mr. Smuda has been the president of OrderPro since the parties entered into the Agreement and has held other corporate positions for at least part of the time.

The Consent Judgment, entered by the court on February 14, 2006, is a valid court order entered pursuant to the Agreement.  Although Mr. Titus did not present any specific evidence of OrderPro having notice of the Consent Judgment, the court finds that OrderPro had such notice.  The court filed the Consent Judgment electronically, which sent the Consent Judgment to OrderPro's lawyers at the time electronically.  The Consent Judgment was also sent to Mr. Smuda by regular mail.  Further, OrderPro acknowledges the Consent Judgment was entered on February 14, 2006 and that it has not complied with several of its terms.

---

[14]Mr. Titus argues OrderPro included evidence in its proposed findings of fact beyond that which it presented at the evidentiary hearing.  Mr. Titus then claims he was forced to present additional information and documentation as rebuttal evidence in his reply brief.  The court will consider all of the additional information the parties presented in their briefs.  As mentioned above, however, the court will not consider Mr. Titus's supplemental reply, which was filed without leave of court.

[15]Doc. 209, ex. 1, at 4.

[16]*See* Pl. Hearing Ex. 17.

Mr. Titus alleges OrderPro should be held under contempt for violating three provisions of the Consent Judgment. OrderPro admits it has not complied with the three provisions. Specifically, OrderPro has not paid Mr. Titus any money in an effort to satisfy the money judgment made against it in the Consent Judgment, has not given Mr. Titus prior notice of its board of directors meetings, has not allowed Mr. Titus to attend any board of directors meetings in person or by telephone as a nonvoting advisor, and has not transferred to Mr. Titus 7 million shares of unrestricted OrderPro stock. OrderPro, however, has never sought relief from the Consent Judgment.

Mr. Smuda testified that OrderPro does not have any funds to pay the money judgment. Mr. Titus sought OrderPro's financial records before the evidentiary hearing. OrderPro produced only redacted records. At the evidentiary hearing, the court ordered OrderPro to produce the records unredacted during a court recess. The court then accepted the records into evidence.[17] The records, which consist mostly of bank statements, show OrderPro made several substantial deposits since the time the Consent Judgment was entered. The most recent statement the court has for OrderPro's Bank of America account shows a negative balance as of December 31, 2006. The most recent statement the court has for OrderPro's Canyon Community Bank account shows a zero balance as of February 28, 2006. The most recent financial information the court has is OrderPro's August 31, 2007 Compass Bank account statement, which shows a $351.61 balance. Mr. Smuda said OrderPro's

---

[17]Pl. Hearing Ex. 15.

accountant in California had the rest of the financial records, including tax records.  These records have never been produced as evidence in this contempt proceeding.

Mr. Smuda testified at the evidentiary hearing that OrderPro maintained a bank account at Bank of the West, among a few other banks.  Mr. Titus and Team Logistics attempted to garnish OrderPro's bank account at Bank of the West in December 2007.[18] After receiving the court's order of garnishment,[19] Bank of the West answered that OrderPro did not have an account at the bank.[20]

OrderPro elected Mr. Titus to its Board of Directors on November 15, 2005.  Because OrderPro did not carry director liability insurance at that time, Mr. Titus declined membership to OrderPro's board of directors.  Since then, OrderPro has not given Mr. Titus notice of any of its board of directors meetings.  OrderPro provided Mr. Titus the dates of the meetings between October 2005 and February 2007 in a letter dated August 30, 2007.  Mr. Titus suggests through unsworn testimony that OrderPro has not provided him notice of any meetings since the evidentiary hearing.

Mr. Smuda testified that until February 2007 it was the duty of Patricia Green, a former OrderPro officer, to give Mr. Titus notice of the meetings.  After that, it became Mr. Smuda's duty to give Mr. Titus notice, but Mr. Smuda did not think Mr. Titus should be

---

[18]*See* doc. 245.

[19]*See* doc. 246.

[20]*See* doc. 247.

notified.  Mr. Smuda testified he considered Mr. Titus to be disruptive to the company and that he was concerned over the legal implications to OrderPro of providing such notice. OrderPro has also failed to allow Mr. Titus to attend any meetings of the board of directors in person or by telephone as a nonvoting advisor.

Mr. Smuda testified that, at the time the parties entered into the Agreement, he mistakenly believed the 7 million shares of OrderPro stock could be transferred to Mr. Titus unrestricted although they were restricted in the possession of Mr. Smuda.  OrderPro transferred 7 million shares of restricted stock to Mr. Titus on or around January 9, 2006. Significantly, OrderPro has transferred millions of unrestricted shares of stock both before and after the restricted shares were issued to Mr. Titus.

Despite his efforts to remove the restrictions, Mr. Titus's 7 million shares of OrderPro stock are still restricted.  The two-year period on the Section 144 restrictions on Mr. Titus's shares has now ended, and the restrictions may be lifted.  The stock sold for $.01 per share in February 2006, for $.0023 per share on the date of the evidentiary hearing, and for $.003 per share in February 2008.

At the evidentiary hearing, Mr. Titus presented evidence of the attorney's fees he has incurred in trying to seek enforcement of the Agreement and the Consent Judgement.[21] During his testimony, Mr. Titus marked his attorney's bills to exclude those items which were not related to enforcement efforts against OrderPro.  Mr. Titus then attached an adding

---

[21]*See* Pl. Hearing Exs. 6 & 7.

machine tape of all attorney's fees and additional costs related to enforcement efforts against OrderPro to his proposed findings of facts and conclusions of law.[22]  Mr. Titus attached another attorney's bill to his reply, which seems to represent his attorney's fees incurred since the time of the evidentiary hearing.[23]

IV.   Conclusions of Law

A.   Contempt Standards

The court's power to punish for contempt is an inherent power of the federal courts.[24] These powers are governed by the control vested in courts to manage their own affairs, as opposed to by rule or statute.[25]  Contempt penalties serve the limited purpose of vindicating the authority of the court, as opposed to punishing violations of substantive law.[26]  Federal law, as opposed to state law, therefore governs the court's power of contempt.[27]  Although the parties' Agreement states it is governed under Kansas law,[28] the court finds the Kansas state law cases on contempt cited by Mr. Titus are not persuasive.

---

[22]Doc. 249, ex. 1.

[23]Doc. 253, ex. 5.

[24]*New York v. Terry*, 45 F.3d 17, 23 (2d Cir. 1995).

[25]*Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).

[26]*Id.*

[27]*See id.* (holding that even if a state law claim was the only basis for an injunction, "federal law governs the severity of the sanction for contumacious disregard of a federal court injunction").

[28]Doc. 209, ex. 1, at para. 6.

"The primary purpose of a civil contempt sanction is 'to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance.'"[29] In contrast, "the primary purpose of a criminal contempt is to punish defiance of a court's judicial authority."[30] Here, Mr. Titus seeks an order finding OrderPro in indirect civil contempt.

The party seeking a contempt order bears the burden to establish, by clear and convincing evidence, that "a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order."[31] Even if the movant establishes a prima facie case of contempt, the district court retains broad discretion in determining whether to hold a party in contempt and, if so, the type, character, and extent of relief available.[32]

As mentioned above, "[s]anctions for civil contempt may only be employed for either or both of two distinct remedial purposes."[33] Where the purpose of a contempt sanction is

---

[29]*Braintree Labs., Inc. v. Nephro-Tech, Inc.*, 99 F. Supp. 2d 1300, 1303 (D. Kan. 2000) (footnote omitted) (quoting *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1438, 1442 (10th Cir. 1998)).

[30]*Id.* at 1303 n.1 (quoting *Ager v. Jane C. Stormont Hosp. & Training Sch. for Nurses*, 622 F.2d 496, 499-500 (10th Cir. 1980)).

[31]*Id.* at 1303 (quoting *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998)).

[32]*Id.*; *Entech Sys., Inc. v. Bhaskar*, 72 F. Supp. 2d 1272, 1276 (D. Kan. 1999).

[33]*O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992).

to compel or coerce obedience to a court order, "the court must consider 'the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'"[34] The court should exercise "the least possible power adequate to the end proposed."[35]   Therefore, coercive civil sanctions must terminate upon compliance.[36]  Where the purpose of a contempt sanction is to compensate for losses resulting from the contemnor's noncompliance, the amount of the fine imposed must be based upon the complainant's actual loss.[37]  Such damages need only be proven by a preponderance of the evidence.[38]  Although "civil contempt is an appropriate remedy for the enforcement of a judicial decree, . . . it is a severe one which should be used only when necessary to sustain the authority of the court."[39]

A corporation's president may be held jointly liable with the corporation for contempt.[40]  "A command to a corporation is in effect a command to those who are officially

---

[34]*Id.* (quoting *United States v. United Mine Workers*, 330 U.S. 258, 304 (1947)).

[35]*Id.* (quoting *Spallone v. United States*, 493 U.S. 265, 280 (1990)).

[36]*Id.* (quoting *United States v. Prof'l Air Traffic Controllers Org.*, 703 F.2d 443, 445 (10th Cir. 1983)).

[37]*Id.*; *Entech Sys., Inc.*, 72 F. Supp. 2d at 1276.

[38]*FTC v. Kuykendall*, 371 F.3d 745, 751 (10th Cir. 2004).

[39]*Braintree Labs., Inc.*, 99 F. Supp. 2d at 1303 (quoting *NLRB v. Shurtenda Steaks, Inc.*, 424 F.2d 192, 194 (10th Cir. 1970)).

[40]*See Kuykendall*, 371 F.3d at 759.

responsible for the conduct of its affairs."[41]   An officer of a corporation is therefore

"obligated 'to take appropriate action within his power for the performance of the corporate

duty,'" which can subject him to an order of contempt.[42]   Whether the corporate officer is

named as a defendant in the action is not controlling.[43]

B.     Defenses to Contempt

A finding of civil contempt may be avoided if the party accused of contempt has taken

all reasonable steps and has substantially complied with the court's order.[44]   A separate but

related defense is when a defendant shows by clear and convincing evidence that it is

"plainly and unmistakenly" unable to comply with the court order.[45]   Once the party seeking

an order of contempt makes his prima facie case, the burden shifts to the defendant to show

---

[41]*Id.* (quoting *Wilson v. United States*, 221 U.S. 361, 376 (1911)).

[42]*Id.* (quoting *Wilson*, 221 U.S. at 376).

[43]*See Elec. Workers Pension Trust Fund of Local Union #58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 382 (6th Cir. 2003).

[44]*Braintree Labs., Inc.*, 99 F. Supp. 2d at 1303; *Entech Sys., Inc.*, 72 F. Supp. 2d at 1276.   *But see Phone Directories Co. v. Clark*, 209 F. App'x 808, 815 (10th Cir. 2006) (stating that the Tenth Circuit has not previously recognized substantial compliance as a defense in a contempt proceeding and declining to decide the issue).

[45]*Phone Directories Co.*, 209 F. App'x at 815 n.6; *Donovan v. Burgett Greenhouses, Inc.*, 759 F.2d 1483, 1486 (10th Cir. 1985).   OrderPro cites to an Eleventh Circuit case for the proposition that a party sufficiently shows an inability to comply by merely showing it is has made in good faith all reasonable efforts to comply.   *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998).   The court does not find this case persuasive and instead will apply the more rigorous "plainly and unmistakenly" unable standard of the Tenth Circuit.

an inability to comply.[46]  This is particularly true when a defense, such as financial inability

to comply, rests on facts which are peculiarly within the defendant's own knowledge.[47]

Unless a court directs otherwise, a money judgment is enforced by a writ of

execution.[48]  A consent judgment making an award of money is a money judgment.[49]  A

person may not "be imprisoned for debt on a writ of execution or other process issued from

a court of the United States in any State wherein imprisonment for debt has been

abolished."[50]  Further, Section 16 of the Kansas Constitution Bill of Rights provides that

"[n]o person shall be imprisoned for debt, except in cases of fraud."

C.    Analysis

Mr. Titus, as the party seeking a contempt order, bears the burden to show by clear

and convincing evidence that a valid court order existed, that OrderPro had knowledge of the

order, and that OrderPro disobeyed the order.  The court finds Mr. Titus has met his burden

as all three requirements, i.e., OrderPro admits it knowingly failed to comply with the

Consent Judgment provisions discussed above.

The burden now shifts to OrderPro to show it should not be held in contempt because

---

[46]*See O'Connor*, 972 F.2d at 1210; *Donovan*, 759 F.2d at 1486.

[47]*Donovan*, 759 F.2d at 1486.

[48]Fed. R. Civ. P. 69(a)(1); *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 980 (11th Cir. 1986).

[49]*See Combs*, 785 F.2d at 980.

[50]28 U.S.C. § 2007(a).

of some defense.  Because OrderPro essentially has not even attempted to comply with the Consent Judgment, it certainly cannot argue persuasively that it is in substantial compliance. Further, the court finds OrderPro did not meet its burden to show by clear and convincing evidence that it is plainly and unmistakenly unable to comply with the Consent Judgment. OrderPro's argument that its noncompliance was not done in bad faith is irrelevant to the standard OrderPro must meet in the Tenth Circuit.

OrderPro has not shown by clear and convincing evidence that is unable to comply with the court's order that it pay Mr. Titus $135,000 plus interest at the rate of ten percent per annum and the costs of this action.  Mr. Smuda's self-serving, ever-shifting testimony that OrderPro has no money, coupled with OrderPro's incomplete bank statements, do not show a clear enough picture of OrderPro's current financial condition for it to meet the clear and convincing impossibility standard.[51]

The court is not convinced by Mr. Smuda's argument that because Ms. Green was supposed to give Mr. Titus notice of board of directors meetings, Mr. Smuda and the company should not be held in contempt.  OrderPro, the entity, did not comply with the Consent Judgment.  Further, Mr. Smuda, as president, had responsibility to ensure the company's responsibilities were being taken care of.  The court is also not convinced that

---

[51] Of course, during the evidentiary hearing, the court had the opportunity to closely observe the demeanor of the witnesses.  Mr. Titus's testimony was unremarkable, i.e., most of the facts to which he testified were not seriously in dispute.  As for Mr. Smuda, he seemed to be an affable fellow.  But as a whole his testimony struck the court as a bit too slick. Often he was evasive and non-responsive.  As a result, he was not very credible.

because Mr. Titus turned down board of directors membership, OrderPro was relieved of its duties to give him notice of meetings.  The Agreement, which was specifically incorporated into the Consent Judgment, required OrderPro to elect Mr. Titus to the board of directors once they secured director liability insurance; the Agreement, although not a model of precision on this point, nonetheless contemplated that OrderPro would secure (i.e., pay for) director liability insurance to cover Mr. Titus.  Because OrderPro did not have such insurance at the time, OrderPro has still not fulfilled its duty to elect Mr. Titus to the board, which is independent of its duty to give him notice and an opportunity to attend meetings.

Mr. Titus argues once he proved his prima facie case for contempt, the burden shifted to OrderPro to explain why the shares of stock were restricted when they were transferred to Mr. Titus.  The court does not find that such an explanation is necessary to prove the impossibility defense.  OrderPro, however, has not met its standard to show complying with the Consent Judgment regarding unrestricted shares is plainly and unmistakenly impossible. The restrictions on the shares can now be removed.

The court finds that Mr. Smuda, as the president of OrderPro at all times since the entry of the Consent Judgment, is jointly liable with the corporation for the contempt orders and any related judgments listed below.  Mr. Smuda was obligated to ensure OrderPro complied with the Consent Judgment.  It is irrelevant that the claims against Mr. Smuda as an individual defendant have since been discharged in bankruptcy.

Mr. Titus seeks several orders and judgments against OrderPro and Mr. Smuda.

Specifically, Mr. Titus requests the court incarcerate Mr. Smuda until he delivers 7 million shares of unrestricted stock to Mr. Titus, pays a first monthly payment of $5,000 of the previous judgment, and provides Mr. Titus with notice of the next board meeting and appoints Mr. Titus to the board of directors.  Mr. Titus further requests money judgments be entered against OrderPro and Mr. Smuda, jointly and severally, for the damages he sustained as result of the stock's loss in value and the attorney's fees he has incurred in attempting to enforce the Consent Judgment.  The court will address each of these requests separately.

OrderPro argues a writ of execution, as opposed to an order of civil contempt, is the proper tool for the enforcement of a money judgment.  OrderPro also argues imprisonment cannot be ordered to enforce a money judgment.  Mr. Titus does not dispute or even address these arguments in his reply brief.  The court agrees with OrderPro and does not hold it in contempt for failing to comply with the money judgment portion of the Consent Judgment. Although the court notes Mr. Titus was unsuccessful at garnishing OrderPro's alleged account at Bank of the West, further garnishment and execution efforts are the processes Mr. Titus should follow to enforce his previous judgment.  Mr. Titus's judgment continues to earn interest at the rate of ten percent per annum until paid in full.

The court declines to incarcerate Mr. Smuda until Mr. Titus receives notice of the next board of directors meeting and is elected to the board.  The court has discretion to determine whether to hold OrderPro and Mr. Smuda in contempt and, if so, the relief available. Incarceration is a very serious sanction.  The court must exercise the least possible power to

compel obedience to the Consent Judgment.  But, in the hopefully unlikely event OrderPro and Mr. Smuda fail to comply timely with the Consent Judgment and the directives in the instant order, they are on notice that the court probably will impose substantial fines, i.e., of at least $500 per day.

OrderPro cannot effectively give Mr. Titus notice of or the opportunity to attend past board of directors meetings.  The court admonishes OrderPro that it must give Mr. Titus notice of all future meetings reasonably in advance of those meetings and must provide him with the opportunity to attend the meetings as a nonvoting advisor.  Further, as required by the Agreement, which was incorporated into the Consent Judgment, OrderPro shall elect Mr. Titus to its board of directors once it obtains director liability coverage.  Mr. Titus was not and is not required to seek notice or permission to attend the meetings.

The court finds OrderPro and Mr. Smuda in contempt for failing to transfer 7 million unrestricted shares of OrderPro stock to Mr. Titus.  OrderPro shall cooperate fully in ensuring the restrictions on Mr. Titus's shares of stock are promptly removed, including by providing a letter from its SEC attorney approving the release of the restrictions by **April 18, 2008**, and paying any necessary fees.  Mr. Titus shall also cooperate by ensuring his shares are presented to the proper transfer agent for conversion.

The court finds the value of OrderPro stock has diminished since the entry of the Consent Judgment.  Mr. Titus has therefore suffered damages as a result of not receiving unrestricted stock in February 2006.  The value of the stock may change before the

restrictions on Mr. Titus's shares are lifted.  Therefore, in order to determine Mr. Titus's actual loss, the court will wait to grant a judgment to Mr. Titus for the loss in share value until the restrictions are lifted.  After the restrictions are lifted, counsel for Mr. Titus and counsel for OrderPro shall confer and attempt to reach a stipulation as to the loss in value of the stock from February 2006 to the date restrictions were lifted.  If such a stipulation is reached, Mr. Titus shall then file it with the court.  If a stipulation cannot be reached, Mr. Titus shall file a motion for a judgment on the loss of stock value, including evidence of the stock's past and current values.  OrderPro will have an opportunity to respond to Mr. Titus's evidence of stock values.  Once the court either receives the joint stipulation as to stock value or Mr. Titus's motion and OrderPro's response, it will enter a judgment against OrderPro and Mr. Smuda, jointly and severally.

Mr. Titus's motion seeks a separate and additional judgment for his attorney's fees and additional costs incurred in attempting to enforce the Consent Judgment against OrderPro.  The evidence presented at the hearing includes attorney's fees and costs incurred by Mr. Titus in seeking to enforce the Agreement, including in the filing of the motion to enforce the Agreement.  Mr. Titus did not follow the court's order in the Consent Judgment that if he wished to impose attorney's fees as a matter of contract law, he could file a separate motion to alter or amend the Consent Judgment and follow the procedure articulated in D. Kan. Rule 54.2.

Mr. Titus presented two attorney's bills as exhibits at the evidentiary hearing.  He

placed a mark by items he believed did not relate to his enforcement efforts against OrderPro. Many items appear on both bills, but some are inconsistently marked and therefore were included in Mr. Titus's adding machine tape although they were marked on one bill to be excluded from the fees sought. Mr. Titus attached a third attorney's bill to his reply showing expenses incurred since the evidentiary hearing. OrderPro has not had an opportunity to respond to this evidence.

Mr. Titus is entitled to his attorney's fees incurred in seeking enforcement of both the Agreement and the Consent Judgment. Because Mr. Titus did not follow the procedure ordered in the Consent Judgment and because there are discrepancies in the evidence of attorney's fees, the court will not impose a separate and additional judgment for attorney's fees and additional costs at this time. In order for Mr. Titus to obtain such a judgment, he must file a separate motion for attorney's fees and follow the procedures outlined in D. Kan. Rule 54.2. The court will also enter this judgment against OrderPro and Mr. Smuda, jointly and severally. Given the holdings stated herein, the court finds OrderPro's request for costs and attorney's fees is inappropriate.

## V.   Conclusion

Mr. Titus's motion for citation for OrderPro to show cause why it should not be punished for indirect civil contempt **(doc. 224)** is granted. After considering the evidence presented at the evidentiary hearing on September 14, 2007, the court holds OrderPro (and its president, Mr. Smuda) in contempt for failing to comply with the Consent Judgment.

OrderPro and Mr. Smuda shall cooperate fully in ensuring the restrictions on Mr. Titus's

shares of stock are promptly removed, including by providing a letter from its SEC attorney

approving the release of the restrictions by **April 18, 2008**, and paying any necessary fees.

Once the restrictions on Mr. Titus's stock are lifted, the court will grant him a judgment for

the loss in value of the stock resulting from OrderPro's noncompliance with the Consent

Judgment.  Mr. Titus will also be granted a separate judgment for his attorney's fees and

costs incurred in attempting to enforce both the Agreement and the Consent Judgment.

IT IS SO ORDERED.

Dated this 8th day of April, 2008 at Kansas City, Kansas.


 s/James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge